**QUINN v. EARL BRAY, Inc.**

Civ. 5302.

United States District Court
W. D. Oklahoma.

Nov. 3, 1952.

Berry & Cotter, Oklahoma City, Okl., and Doyle Watson, Drumwright, Okl., for the plaintiff.

Leonard E. Roach, Oklahoma City, Okl., and Dudley, Duvall & Dudley, Oklahoma City, Okl., for the defendant.

WALLACE, District Judge.

The plaintiff brings this action under the Fair Labor Standards Act,[1] to recover overtime compensation for work he performed while employed by the defendant from November 16, 1949, until August 5, 1951. Defendant is engaged in the transportation of petroleum products by motor truck, in Interstate Commerce.

Two items of recovery are sought. First, plaintiff claims that he is entitled to the over-time rate for all weekly hours worked in excess of 40, as shown by the time cards of defendant. Second, plaintiff

---

[1]. Fair Labor Standards Act of 1938, § 1–19, as amended, 29 U.S.C.A. §§ 201–219.

Section 207 provides: "(a) Except as otherwise provided in this section, no employer shall employ any of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

claims that from April 1, 1951, through August 5, 1951, he worked an estimated 120 hours over the 60 hours, which is the maximum time shown on the time cards for any one week, for which he received no pay. The plaintiff further requests that these unpaid wages be doubled by way of penalty.[2]

The defendant contends that the plaintiff was not under the Fair Labor Standards Act, but was under the Interstate Commerce Act which permitted a work week up to 60 hours at straight time,[3] and denies that plaintiff ever worked more than 60 hours in any one work week.

There has been a great deal of litigation construing the relative positions of the two Acts under consideration. It is clear that Congress meant to have the Fair Labor Standards Act construed liberally and to include all employees not expressly excepted.[4] However, section 213(b) of this Act states:

"The provisions of section 207 of this title shall not apply with respect to (1) any employee with respect to whom the Interstate Commerce Commission has power to establish qualifications and maximum hours of service pursuant to the provisions of *section 304 of Title 49*; * * *." (Emphasis supplied.)

Section 304 of Title 49 provides:

"It shall be the duty of the Commission—

* * * * * *

"(3) To establish for private carriers of property by motor vehicle, if need therefor is found, *reasonable requirements to promote safety of operation*, and to that end prescribe qualifications and maximum hours of service of employees, and standards of equipment. * * *" (Emphasis supplied.)

In construing section 304(3) the Supreme Court has held this empowers the Interstate Commerce Commission to regulate qualifications and hours of service of only such interstate motor carrier *employees whose work affects safety of operation*.[5] To be excepted under the Fair Labor Standards Act it is not necessary that the Interstate Commerce Commission exercise its authority. It is merely a question of whether or not the power exists in the Commission.[6] Also, the actual work done by the employee results in the classification and not the name or title of the position he holds.[7]

In determining what a particular employee must do to come within the jurisdiction of the Interstate Commerce Commission it has been held that the employees' activities affecting safety of operation must

2. 29 U.S.C.A. § 216(b) provides: "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. * * *"

3. 49 U.S.C.A. § 304.

4. Schmidtke v. Conesa, 1 Cir., 1944, 141 F.2d 634; Musteen v. Johnson, 8 Cir., 1943, 133 F.2d 106; McComb v. Robertson, D.C.Tenn.1952, 101 F.Supp. 1018.

5. United States v. American Trucking Associations, Inc., 1940, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

6. Morris v. McComb, 1947, 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44; Mingione v. New England Tallow, Inc., 1950, 137 Conn. 173, 75 A.2d 388.

In the Morris case the court said, "* * * We hold that the Commission has the *power* to establish qualifications and maximum hours of service, pursuant to the provisions of § 204 of the Motor Carrier Act, for the entire classification of petitioner's drivers and 'mechanics' and it is the existence of that power (rather than the precise terms of the requirements actually established by the Commission in the exercise of that power) that Congress has made the test as to whether or not § 7 of the Fair Labor Standards Act is applicable to these employees." 332 U.S. 422, 434, 68 S.Ct. 131, 137.

7. Porter v. Poindexter, 10 Cir., 1947, 158 F.2d 759.

be for a substantial part of his time as distinguished from a majority of his time.[8] However, in Levinson v. Spector Motor Service [9] the Supreme Court ruled that the true determinant is whether or not the employee performs duties which substantially affect safety of operation, rather than whether or not the duties affecting safety are substantial. Thus the emphasis is placed on the effect of the duties on safety of operation rather than the proportion of time spent in doing those duties.

In Pyramid Motor Freight Corp. v. Ispass et al.[10] which was decided in March of 1947 and the Supreme Court Opinion of which was handed down concurrently with the Opinion in the Levinson case the following observation was made: [11]

"* * * if the whole or a substantial part of such alleged 'loading' activities of the respective respondents * * * does come within the kind of activities which, according to the Commission, affect such safety of operation, then those respondents who were engaged in such activities are excluded from the benefits of such § 7. *If some, but less than a substantial part, of such activities* of the respective respondents * * * come within the kind of activities which * * * *affect such safety of operation*, then the right of those respondents who were engaged in such activities to receive the benefits of § 7 of the Fair Labor Standards Act does not come within the precise issue determined in the Levinson case and *this Court reserves its decision as to the power of*

*the Commission to establish qualifications and maximum hours of service with respect to them and, consequently, reserves its decision as to their right to receive the benefits of § 7 of the Fair Labor Standards Act.*" (Emphasis supplied.)[12]

Subsequently, in Morris v. McComb [13] the Supreme court reemphasized that it is the character of the employee's activities rather than the proportion of either his time or of his activities that determines the actual need for the Interstate Commerce Commission's power to establish qualification and maximum hours of service. It further held that the Commission has power to establish qualifications and maximum hours of service with respect to drivers and mechanics employed full time, as such, by a common carrier by motor vehicle, when the services rendered through such employees by such carrier in interstate commerce are distributed generally throughout the year, constitute 3% to 4% of the carrier's total carrier services, and the performance of such services is shared indiscriminately among such employees and mingled with their performance of other like services for such carrier not in interstate commerce.

Thus, it appears that the question expressly reserved in the Pyramid case has been ruled upon, at least by implication. The 3% to 4% in the Morris case is certainly less than a "substantial part of such activities". Yet where the duties substantially affected safety of operation only for a small percentage of the total work time, the Interstate Commerce Commission was deemed to have power to control.

---

8. Crean v. M. Moran Transp. Lines, D.C. N.Y.1944, 57 F.Supp. 212.

9. 1947, 330 U.S. 649, 67 S.Ct. 931, 91 L. Ed. 1158. At 330 U.S. 649, 674–675, 67 S.Ct. 931, 944, the court said: "* * * It is the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the Commission's power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment. * * * "

10. 1947, 330 U.S. 695, 67 S.Ct. 954, 91 L. Ed. 1184.

11. 330 U.S. 695, 708, 67 S.Ct. 954, 961.

12. The principle announced in the Pyramid case is the same as the one involved in the case at bar. The Pyramid case dealt with a classification made by the Commission in control of safety of operation. However, whether or not the Commission has exercised its power is immaterial. The question is "does it have the power?" (See footnote 6, supra)

13. Footnote 6 supra.

The plaintiff in the instant case is neither solely a "mechanic" nor a mere "utility man" as distinguished in Ex Parte No. MC–2 and cited with approval in the Morris case.[14] He contends that he was a utility worker whose tasks had no bearing on the safety of operation. He submitted that his work was limited to sweeping the executive offices of the company, sweeping the shop, changing tires, oiling and greasing tractors and trailers, filling gas tanks, putting water in batteries and radiators, obtaining and handing tools to defendant's mechanics, picking up and putting tools away, helping mechanics lift heavy parts into place on the trucks and trailers, setting bolts for mechanics to tighten and adjust, and work of like character. He emphasizes that his comparably low rate of pay supports the argument that he in no way was a mechanic. Although the rate of pay is pertinent it is not conclusive. The court has considered the evidence very carefully and believes that in addition to the duties outlined above the plaintiff not only assisted the other mechanics in the work which they did but he himself inspected the truck-tractors and trailers for *defects of various kinds*. This included checking for loose tie rods, broken springs, defective light bulbs, defective brakes, leaking valves on the cargo gasoline trailer tanks, faulty head light seal beams, and included further the inspecting of tires and wheel lugs, the fifth wheel or tractor-trailer hook-up device [together with the connecting brake air lines]. He checked brake air lines and repaired air leaks, installed windshield wipers, removed wheels, changed tires and remounted wheels, and made hookups between trailer and tractor including hooking up light connections and the brake air hose.

The court is of the opinion that a majority of the time of the plaintiff was spent in work not directly affecting safety of operation, and is cognizant of the various arguments which would make "time spent" a governing element.[15] However,

---

14. "(1) Mechanics and other garage workers.—

\* \* \* \* \*

"The larger carriers \* \* \* do employ mechanics whose primary duties are to keep the motor vehicles in a good and safe working condition. They are required, for example, to keep the lights and brakes in such condition. They perform many other duties, of course, but these are sufficient to show clearly that the duties of these employees do affect safety of operation directly, as it is obvious that a large motor vehicle without the required lights or adequate brakes is a great potential hazard to highway safety. \* \* \*

"\* \* \* there are other garage employees who do not perform work which affects safety of operation directly. Some carriers employ men who do nothing but paint vehicles. Others employ carpenters, and some few employ tarpaulin tailors. We find that the work done by none of these employees affects safety of operation.

"It is possible \* \* \* that some of the larger carriers employ men whose sole duty is to see that the motor vehicles are properly supplied with oil, gas and grease, or to wash the vehicles. In the majority of cases, undoubtedly, the mechanics perform this work. However, if there be employees who do nothing but oil, gas, grease, or wash the motor vehicles, we find that they do not perform duties which directly affect the safety of operation and are not subject to our jurisdiction. To make our finding entirely clear, it is that mechanics are the only garage workers we find subject to our jurisdiction." Ex parte No. Mc–2, 28 M. C.C. 125, 132, 133.

15. Mr. Justice Rutledge in his dissent in the Levinson case [footnote 9 supra] agreed that "substantial effect" upon safety rather than "substantial time" spent in doing work affecting it determines the scope of the Interstate Commerce Commission. However, in his mind no essential inconsistency existed between the two statutes or their operation and he would give the Commission the power as to safety, and would give the employee the benefit of the over-time provision of the Fair Labor Standards Act.

His rationale was, "\* \* \* it cannot be taken that Congress intended every employee assigned for a few minutes daily or weekly to work substantially affecting safety to be eliminated from the overtime pay provisions. Such a view in practical effect would nullify the Act's broad and inclusive purposes for large numbers of employees as to whom, at the time, the Commission had shown no concern in exercising its safety power or in its representations to Congress, and

under the law, this is not the test. The test is whether or not he had duties which substantially affected safety of operation. He unquestionably did! Although he was not employed solely as a mechanic, it is obvious he was more than a janitor and utility service man. This conclusion is corroborated by the fact that the plaintiff was required to purchase a complete set of mechanic's tools, to enable him to properly discharge his duties, at the very time he went to work for the defendant.

Judgment should be for the defendant.

Counsel are directed to submit a journal entry in conformity with this opinion within ten days.

as to whom therefore there was no sound reason for or purpose of exemption.

"Moreover, acceptance of such a construction would set up an easy mode for evasion of the Fair Labor Standards Act's requirements. An employer so minded readily could assign to nonsafety employees whom he desired to remove from the overtime pay requirement work affecting safety for minute portions of their total service." 330 U.S. 649, 690, 67 S.Ct. 931, 951.